# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JUSTIN MICHAEL ENRIGHT,** | : | **CIVIL NO. 1:14-CV-103** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Justin Michael Enright ("Enright"), a federal inmate formerly housed at the Perry County Prison, New Bloomfield, Pennsylvania, commenced this action on January 17, 2014.[1] (Doc. 1). The matter is presently proceeding *via* a second amended complaint (Doc. 58), wherein Enright alleges that he received inadequate medical care at the Perry County Prison, resulting in a violation of his constitutional rights. Named as defendants are Perry County, Commissioner Brenda Benner, Commissioner Stephen Naylor, Commissioner Paul Rudy, Jr., Warden David Yeingst, Deputy Warden Long (collectively, "Perry County defendants"), and PrimeCare Medical, Inc. ("PrimeCare"), and Nurse Beth Heckman (collectively, "medical defendants").

---

[1] On January 27, 2017, Enright was released from federal custody and is no longer incarcerated. See Federal Bureau of Prisons Inmate Locator, available at: https://www.bop.gov/inmateloc/

On September 15, 2016, the court granted in part and denied in part motions to dismiss by the Perry County defendants and the medical defendants. (See Docs. 85, 86).

The remaining claims against the Perry County defendants are: (1) an Eighth Amendment deliberate indifference claim based on a diabetic incident; (2) an Eighth Amendment deliberate indifference claim based on the confiscation of Enright's cane; (3) an Eighth Amendment deliberate indifference claim based on allegations that prison officials attempted to influence hospital officials to prematurely discharge Enright from their care; and, (4) a Monell[2] claim.

The remaining claims against the medical defendants are: (1) an Eighth Amendment claim for deliberate indifference to a serious medical need; (2) a Monell claim; (3) a Sixth Amendment claim; and, (4) a substantive due process claim.

Before the court is a motion (Doc. 96) for summary judgment pursuant to Federal Rule of Civil Procedure 56 by the Perry County defendants, and a motion (Doc. 100) for summary judgment pursuant to Federal Rule of Civil Procedure 56 by the medical defendants. For the reasons set forth below, the court will grant both pending motions.

## I. **Legal Standard**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative

---

[2] Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978).

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F.Supp.2d at 315.

## II.  Elements of a Section 1983 Claim

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

### III.  **Facts Pertinent to Perry County Defendants'**

#### A.  **Background**

Enright was incarcerated at Perry County Prison from June 2011 until June 2012. (Doc. 97, Statement of Material Facts, ¶ 1; Doc. 107, Counterstatement of Material Facts, ¶ 1). Enright was a federal inmate housed at Perry County Prison pursuant to a contract between Perry County and the United States Marshals Service. (Doc. 97 ¶ 2; Doc. 107 ¶ 2). As a federal inmate, the United States Marshals Service was responsible for payment of Enright's medical care. (Doc. 97 ¶ 3; Doc. 107 ¶ 3). Enright contends that Perry County was nevertheless responsible for paying prison staff, particularly staff that stayed with Enright at the hospital. (Doc. 107 ¶ 3). It is undisputed that Perry County contracts with PrimeCare to provide medical care for inmates at Perry County Prison. (Doc. 97 ¶ 7; Doc. 107 ¶ 7).

When Enright arrived at Perry County Prison, he used a cane to walk due to a pre-existing leg injury. (Doc. 97 ¶ 4; Doc. 107 ¶ 4). Upon arrival, PrimeCare employee Nurse Heckman conducted a medical intake screening of Enright, and a PrimeCare physician assistant conducted a physical examination of Enright. (Doc. 97 ¶ 5; Doc. 107 ¶ 5). After the screening and physical, Enright was prescribed pain medication for his leg as well as mental health medications. (Doc. 97 ¶ 6). Enright did not inform the medical officials that he suffered from any symptoms of diabetes. (Id.) Enright contends that he informed the medical staff of his family history of diabetes. (Doc. 107 ¶ 6).

Perry County Prison has a sick call policy that inmates are required to follow in order to receive medical attention. (Doc. 97 ¶ 8; Doc. 107 ¶ 8). The sick call policy is included in the inmate handbook that all inmates receive, and Enright testified that he was aware of the sick call policy. (Doc. 97 ¶ 9; Doc. 107 ¶ 9). Pursuant to the policy, when an inmate wishes to see a PrimeCare medical official, the inmate must fill out a sick call form and submit it to a correctional officer. (Doc. 97 ¶ 10; Doc. 107 ¶ 8). Correctional officers are required to pass each form along to PrimeCare staff, and correctional officers have no discretion in determining whether an inmate will be permitted to see medical staff. (Doc. 97 ¶ 10; Doc. 107 ¶¶ 8, 10). Enright contends that correctional officers have discretion in determining whether to allow an inmate to see a nurse before the inmate fills out a formal request. (Doc. 107 ¶ 10).

At the time of Enright's incarceration, correctional officers submitted sick call forms to the PrimeCare medical staff by placing the forms in a folder located on Nurse Heckman's desk. (Doc. 97 ¶ 11; Doc. 107 ¶ 11).

Perry County Prison has a grievance policy that is outlined in the inmate handbook and relates to any alleged violations of inmates' civil and constitutional rights. (Doc. 97 ¶ 12; Doc. 107 ¶ 12). The grievance policy sets forth a system for submitting formal and informal grievances concerning any perceived violation of constitutional or civil rights. (Doc. 97 ¶ 13). If an informal grievance does not resolve an issue, an inmate is required to file a formal written grievance and submit it to prison officials. (Doc. 97 ¶ 14). The grievance policy sets forth an established

procedure for the review, disposition, and appeal of any and all written grievances filed by inmates. (Doc. 97 ¶ 15). Enright admits that Perry County has a grievance policy. He testified that he was aware of the Perry County Prison policy and that he received a copy of the policy in the inmate handbook. (Doc. 97 ¶ 16; Doc. 107 ¶¶ 12, 16). Enright contends that inmates at Perry County Prison were discouraged from filing grievances. (Doc. 107 ¶¶ 12, 16).

**B.    The Confiscation of Enright's Cane**

On July 30, 2011, Sergeant Rodney Keller was on-duty at Perry County Prison and was stationed in the main control room of the facility. (Doc. 97 ¶ 17; Doc. 107 ¶ 17). While monitoring surveillance cameras in Enright's cell block, Sergeant Keller observed Enright walk up behind another inmate and raise his cane in the air, motioning as if he intended to strike the other inmate, who was speaking on the telephone. (Doc. 97 ¶ 18). Enright admitted in his deposition that he walked up behind another inmate with his cane and motioned as if to swing the cane like a bat. (Doc. 97 ¶ 19). Based on Sergeant Keller's observations, he believed that Enright was a security threat because he attempted to use the cane as a weapon and may use the cane to assault another inmate. (Doc. 97 ¶ 20). Since Sergeant Keller viewed Enright and his cane as a security threat, the cane was immediately confiscated from Enright. (Doc. 97 ¶ 21). Enright contends that although he made the swinging motion with his cane, he did so in a joking manner and did not intend to strike an inmate. (Doc. 107 ¶¶ 18-21).

Sergeant Keller prepared an Incident Report detailing the incident. (Doc. 97 ¶ 22; Doc. 107 ¶ 22). On July 31, 2011, defendant Warden Yeingst received and reviewed Sergeant Keller's Incident Report, and determined that Enright's possession of the cane constituted a security threat since Enright demonstrated an ability or willingness to use the cane to assault other inmates or staff members. (Doc. 97 ¶ 23). Based on his review of the Incident Report, defendant Warden Yeingst confiscated Enright's cane from him while he was in his cell block. (Doc. 97 ¶ 24). Enright maintains that although he made the swinging motion with his cane, he was not a security threat because he did not intend to strike another inmate. (Doc. 107 ¶¶ 18-21).

Deputy Warden Long was not involved in the decision to withhold Enright's cane from him in the cell block. (Doc. 97 ¶ 25). Enright contends that Deputy Warden Long was aware of the incident based on his position as deputy warden, and because Nurse Heckman informed him about the incident. (Doc. 107 ¶ 25).

The parties dispute whether the decision to keep Enright's cane from him while he was in his cell block served the legitimate penological interests of maintaining institutional security and inmate safety. (Doc. 97 ¶ 26; Doc. 107 ¶ 26). The Perry County defendants contend that Enright's attempt to use the cane as a weapon suggested that he posed a risk of assaulting other inmates and staff members. (Doc. 97 ¶ 26). Enright contends that he did not intend to strike another inmate, and he swung the cane in a joking fashion. (Doc. 107 ¶ 26). Before making the decision to confiscate Enright's cane, defendant Warden Yeingst conferred with

PrimeCare medical staff, who informed him that it was medically acceptable for Enright to be without his cane in the cell block. (Doc. 97 ¶ 27). Defendant Nurse Heckman confirmed that she provided the initial medical clearance to Warden Yeingst for the cane to be taken from Enright in the cell block. (Doc. 97 ¶ 28).

Defendant Nurse Heckman was present at a physical examination of Enright that occurred around the time of the cane confiscation, and she prepared a treatment note wherein she stated that, based on Enright's examination, he was "quite capable of walking short distances without cane." (Doc. 97 ¶ 29). Enright maintains that he experiences increased pain in his legs when walking without his cane. (Doc. 107 ¶¶ 27-29).

Although Enright's cane was taken from him in the cell block, Enright was still permitted to use the cane outside of the cell block, for example, when he walked to pill call or the medical office. (Doc. 97 ¶ 30; Doc. 107 ¶ 30). PrimeCare approved of defendant Warden Yeingst's decision to permit Enright to have the cane while outside the cell block. (Doc. 97 ¶ 31).

The parties dispute whether Enright was capable of walking without his cane. (Doc. 97 ¶¶ 32-33; Doc. 107 ¶¶ 32-33). The Perry County defendants contend that inmate watch sheets reflect that Enright was able to ambulate throughout the cell block without his cane, traversing from his cell to the day room, standing in his cell, and preparing his laundry. (Doc. 97 ¶ 32). Sergeant Keller personally observed Enright on several occasions during the time the cane was withheld from

him in the cell block, and Sergeant Keller witnessed that Enright was able to walk without the cane with no difficulty. (Doc. 97 ¶ 33).

Enright's cane was returned to him on August 9, 2011. (Doc. 97 ¶ 34). The Perry County defendants contend that the period of time from July 30, 2011 until August 9, 2011 was the only time during Enright's incarceration at Perry County Prison during which his cane was withheld from him. (Doc. 97 ¶ 35). The Perry County defendants further contend the only reason Enright's cane was confiscated from him was his own misconduct in attempting to use it as a weapon, thereby jeopardizing institutional security. (Doc. 97 ¶ 36). Enright contends that there was at least one additional occurrence when his cane was removed from him. (Doc. 107 ¶ 34).

Enright never filed any grievances concerning the confiscation of his cane. (Doc. 97 ¶ 37). Enright states that he was released from Perry County Prison in June 2012, he did not file his initial complaint until January 2014 and, thus, the prison's grievance policy did not apply to him during the time of filing his complaint. (Doc. 107 ¶ 37). Enright remembers filing a grievance regarding the confiscation of his cane. (Id.)

### C.    Enright's Diabetes Diagnosis and Hospitalization

On December 25, 2011, Enright's cellmate reported to a correctional officer that Enright was confused as to the date and time, and was not bathing regularly. (Doc. 97 ¶ 38; Doc. 107 ¶ 38). The correctional officer wrote an Incident Report and placed it in defendant Nurse Heckman's sick call folder. (Id.) On December 28,

2011, defendant Heckman returned to work and received the report. (Doc. 97 ¶ 39; Doc. 107 ¶ 39). In a Shift Change Report prepared on December 25, 2011, it was further noted that correctional officers took efforts to ensure that Enright would be seen by medical staff "due to noticeable change in demeanor." (Doc. 97 ¶ 40; Doc. 107 ¶ 40). The Report did not note any of the other symptoms from which Enright now claims he suffered at that time. (Id.) Enright contends that no further efforts were made to have him treated by medical before December 28. (Doc. 107 ¶¶ 39-40). Defendant Warden Yeingst did not receive a copy of the December 25, 2011 Incident Report. (Doc. 97 ¶ 41). Enright contends that, based on Yeingst's role as warden, it can be inferred that he knew what was occurring at the prison. (Doc. 107 ¶ 41).

Prior to receiving the Incident Report on December 28, 2011, defendant Nurse Heckman had no knowledge of any of the symptoms (nausea, dizziness, and excessive thirst) Enright allegedly began experiencing around Thanksgiving 2011, and Enright never submitted a sick call form or other written request to PrimeCare concerning any of those claimed symptoms. (Doc. 97 ¶ 42). The first time defendant Nurse Heckman knew that Enright was experiencing any medical issues was on December 28, 2011 when she received the Incident Report, which only listed disorientation and poor hygiene. (Doc. 97 ¶ 43). Enright contends that while he did not submit any sick call forms, the initial procedure at Perry County Prison was to informally request to see a nurse. (Doc. 107 ¶¶ 42-43).

Enright never submitted a sick call form requesting to see medical staff for any of the symptoms he claims manifested around Thanksgiving 2011, or for any of the symptoms which he now claims to have suffered from November 2011 through January 2012. (Doc. 97 ¶¶ 44. 47; Doc. 107 ¶¶ 44, 47). Enright contends that the informal procedure was to request to see a nurse. (Doc. 107 ¶ 47). Enright did submit a request form on November 28, 2011, wherein he requested to see a psychiatrist, but did not complain of any of the physical symptoms of which he now complains. (Doc. 97 ¶ 45; Doc. 107 ¶ 45).

From October 2011 through January 2012, Enright consistently made commissary purchases on an almost weekly basis, including Nutty Bars and sugar packets. (Doc. 97 ¶ 46; Doc. 107 ¶ 46). The parties dispute whether Enright complained to any correctional officer about his symptoms. (Doc. 97 ¶ 48; Doc. 107 ¶ 48). The parties agree that Enright expressed general complaints of "a little confusion." (Id.) Enright never asked to see a nurse during this time period. (Doc. 97 ¶ 48).

When defendant Nurse Heckman received the Incident Report concerning Enright on December 28, 2011, she immediately called Enright to the medical office for sick call at approximately 8a.m. (Doc. 97 ¶ 49; Doc. 107 ¶ 49). Later that day, Enright was also seen by a PrimeCare physician assistant at the facility. (Doc. 97 ¶ 50; Doc. 107 ¶ 50). Treatment notes reflect that Enright complained of confusion, with documented weight gain, but none of the other alleged symptoms were noted

in the records. (Doc. 97 ¶ 51; Doc. 107 ¶ 51). As a result of the medical exams, the PrimeCare physician assistant ordered blood work. (Doc. 97 ¶ 52; Doc. 107 ¶ 52).

Defendant Heckman took Enright's blood on December 30, 2011. (Doc. 97 ¶ 53; Doc. 107 ¶ 53). Defendant Heckman was required to seek and obtain written approval from the United States Marshals Service before she could conduct the blood tests. (Id.) The lab results from Enright's blood sample indicated a glucose level of 419, which Nurse Heckman described as high, but not life-threatening. (Doc. 97 ¶ 54).

On January 2, 2012, a PrimeCare nurse at Perry County Prison received the lab results and sent them to a PrimeCare physician assistant. (Doc. 97 ¶ 55; Doc. 107 ¶ 55). The physician assistant immediately placed Enright on an insulin regimen. (Id.) Enright was instructed on how to administer insulin. (Doc. 97 ¶ 56; Doc. 107 ¶ 56). Insulin administration was the responsibility of the inmate. (Doc. 97 ¶ 56; Doc. 107 ¶ 56). PrimeCare Diabetic Record Sheet logs show that Enright tested his glucose and administered insulin doses regularly from January 2, 2012 through January 5, 2012, and his glucose levels dropped by over 150 points in that period of time. (Doc. 97 ¶ 57; Doc. 107 ¶ 57).

On January 4, 2012, Enright was again treated by a PrimeCare physician assistant, who prepared a treatment note in which it was reported for the first time that Enright complained of, *inter alia*, dry mouth, confusion, nausea, and weight loss. (Doc. 97 ¶ 58). Enright contends that although this was the first time his complaints were noted, he previously informed correctional officers of his

symptoms. (Doc. 107 ¶ 58). As a result of the examination, Enright was placed on a 30-minute medical watch, his glucose testing was increased to four times per day, and he was scheduled for a follow-up visit the next week. (Doc. 97 ¶ 59).

On January 5, 2012, correctional officers transferred Enright from his cell block to the medical office with complaints of disorientation and rapid breathing. (Doc. 97 ¶ 60; Doc. 107 ¶ 60). Upon evaluation by PrimeCare medical staff, they determined that Enright should be transported to the hospital for further care. (Doc. 97 ¶ 61; Doc. 107 ¶ 61). Records show that Enright was disoriented but capable of following verbal instructions at that time. (Doc. 97 ¶ 62; Doc. 107 ¶ 62). Approximately forty-five minutes elapsed from the time correctional officers first observed Enright in distress until EMS was summoned to transport Enright to the hospital. (Doc. 97 ¶ 63; Doc. 107 ¶ 63).

Defendant Warden Yeingst had no knowledge of any of Enright's medical issues until January 5, 2012, when he was notified by telephone that Enright was being transported to the hospital. (Doc. 97 ¶ 64). Prior to Enright's hospitalization, no PrimeCare employee— including defendant Nurse Heckman—ever notified defendant Warden Yeingst of any of Enright's alleged medical issues that allegedly manifested in November 2011. (Doc. 97 ¶ 65). Enright never communicated any of his alleged symptoms or medical issues to defendant Warden Yeingst. (Doc. 97 ¶ 66; Doc. 107 ¶ 66). Defendant Warden Yeingst had no subjective knowledge of any serious medical need of Enright at any time prior to his hospitalization on January 5, 2012. (Doc. 97 ¶ 67). Enright contends that although he does not recall speaking

with Warden Yeingst, there were other ways Yeingst could have learned of Enright's condition, such as reading a Shift Change Report. (Doc. 197 ¶¶ 66-67). Defendant Deputy Warden Long had no personal knowledge of any of Enright's reported medical issues prior to his hospitalization. (Doc. 97 ¶ 68). No individual ever notified defendant Deputy Warden Long of any of Enright's alleged medical issues before January 5, 2012. (Doc. 97 ¶ 69).

Enright and defendant Nurse Heckman both testified that they never spoke with any member of the Perry County Prison Board concerning any of Enright's alleged medical issues, and there is no evidence to suggest that any of those individuals had subjective knowledge of any serious medical need of Enright. (Doc. 97 ¶ 70).

Once admitted to the Carlisle Regional Hospital on January 5, 2012, Enright was diagnosed with, *inter alia*, diabetic ketoacidosis and foot drop. (Doc. 97 ¶ 71; Doc. 107 ¶ 71). On January 17, 2012, Enright was discharged from Carlisle Regional Hospital. (Doc. 97 ¶ 72; Doc. 107 ¶ 72). During the course of Enright's hospitalization, defendant Warden Yeingst never spoke to any medical official at Carlisle Regional Hospital about Enright's condition, and defendant Warden Yeingst never attempted to influence any medical provider's decision to discharge Enright from the hospital. (Doc. 97 ¶ 73). Likewise, defendant Deputy Warden Long never spoke to any staff member at the Carlisle Regional Hospital about Enright's treatment and never encouraged or otherwise attempted to influence the decision to discharge Enright from the hospital. (Doc. 97 ¶ 74). Enright contends

that there were conversations in which Warden Yeingst expressed his displeasure with length of time Enright was in the hospital, and a physical therapist relayed this concern to Enright. (Doc. 107 ¶ 73).

The parties dispute whether the decision to discharge Enright from the Carlisle Regional Hospital was solely the decision of Enright's treating medical professionals and no Perry County Prison official had any involvement in that decision. (Doc. 97 ¶ 76; Doc. 107 ¶76-79). A discharge report states that Enright had "achieved rehabilitation goals" at the time of his discharge. (Doc. 97 ¶ 77). In another discharge report issued the day before Enright was actually discharged from the facility, a treating physician stated: "Justin was discussed today in care conference. The team feel that he is progressing, and recommend that he be a discharge in progress. . . . " (Doc. 97 ¶ 78). Enright admits that no treating physician ever told him that the medical staff was being pressured into prematurely discharging him from the hospital. (Doc. 97 ¶ 79).

When Enright returned to Perry County Prison from the hospital, he continued insulin treatment, underwent physical therapy, and received a leg brace that was ultimately confiscated from him when he was returned to federal custody. (Doc. 97 ¶ 80; Doc. 107 ¶ 80).

### D. <u>Inmate Glucometer Testing and Insulin Administration</u>

Correctional officers do not test inmate glucose levels or administer insulin to diabetic inmates at the Perry County Prison. (Doc. 97 ¶ 81; Doc. 107 ¶ 81). Rather, it is Perry County Prison policy that inmates test their own glucose and administer

their own insulin under supervision. (Doc. 97 ¶ 82; Doc. 107 ¶ 82). Specifically, correctional officers escort diabetic inmates to the medical office, where diabetic testing equipment is kept, and the inmate is provided with a glucose strip and lance. (Doc. 97 ¶ 83; Doc. 107 ¶ 83). The Perry County defendants contend that the glucometers are regularly calibrated at Perry County Prison and will not function unless they are calibrated. (Doc. 97 ¶ 84). Once the inmate has tested his glucose level, a supervising correctional officer or PrimeCare employee is informed and records the glucose level on an insulin log. (Doc. 97 ¶ 85). Enright contends that the medical equipment was not always properly calibrated and did not always work, and the logs were not checked properly by prison staff or a PrimeCare employee. (Doc. 107 ¶¶84-85).

The PrimeCare insulin log includes a sliding scale that is printed in the top-right corner of each page, which provides a set dosage of insulin for an inmate to administer based on his glucose level at the time of testing. (Doc. 97 ¶ 86). The dosage of insulin an inmate administers is pre-established by PrimeCare based on the sliding scale contained on the insulin log. (Doc. 97 ¶ 87). Individuals that oversee an inmate's testing have no discretion to deviate from those pre-established dosages. (Doc. 97 ¶ 87). Enright contends that any glucose level over 400 requires a call to a doctor, and he had a score of over 400 but a doctor was not called. (Doc. 107 ¶ 86).

### E.  Medical Staffing at Perry County Prison

At all times relevant to this lawsuit, defendant Nurse Heckman worked at Perry County Prison forty hours per week, and a physician assistant would see inmates at the facility weekly. (Doc. 97 ¶ 88). Enright contends that defenandt Heckman's regular schedule was forty hours per week, however, she did not work Federal holidays, including the two critical holidays prior to the January 4, 2012 incident. (Doc. 107 ¶ 88). When defendant Heckman was absent from her shift, a PrimeCare supervisor exercised discretion over whether to send another nurse to substitute for Nurse Heckman during her shift. (Doc. 97 ¶ 89). Enright contends that Warden Yeingst had the discretion to staff additional individuals during Federal holidays. (Doc. 107 ¶ 89). When no PrimeCare medical staff member was present at the facility, an on-call policy was in place to deal with inmate medical issues at all times. (Doc. 97 ¶ 90; Doc. 107 ¶ 90). The contract between Perry County and PrimeCare states that "all professional medical services providers shall be on-call, twenty-four (24) hours per day, seven (7) days per week." (Doc. 97 ¶ 91; Doc. 107 ¶ 91).

A phone tree is posted throughout Perry County Prison that lists PrimeCare medical providers whom correctional officers are instructed to call, at any time, in connection with non-emergency inmate medical issues that occur when PrimeCare officials are not present at the facility. (Doc. 97 ¶ 92; Doc. 107 ¶ 92). In an emergency situation, officers are instructed to call 911. (Doc. 97 ¶ 93; Doc. 107 ¶ 93). Correctional officers at Perry County Prison have the ability to contact a

medical official for consultation 24 hours a day, 7 days per week, whether or not a

PrimeCare employee was physically present at the facility.  (Doc. 97 ¶ 94; Doc. 107 ¶

94).

## IV.  Perry County Defendants' Motion for Summary Judgment

### A.  Deliberate Indifference to Medical Needs

#### 1.  *Diabetic Incident*

Enright asserts that the Perry County defendants were deliberately

indifferent to his serious medical needs based on a diabetic incident that allegedly

manifested in November 2011 and resulted in Enright's January 2012

hospitalization.  He asserts that he entered Perry County Prison in generally good

health, and his condition deteriorated significantly during his incarceration,

ultimately resulting in a lifelong disability.

For purposes of Eighth Amendment medical claims, nonmedical correctional

staff may not be "considered deliberately indifferent simply because they failed to

respond directly to the medical complaints of a prisoner who was already being

treated by the prison doctor."  Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

The rationale for this rule has been aptly explained by the United States Court of

Appeals for the Third Circuit as follows:

> If a prisoner is under the care of medical experts . . . , a nonmedical
> prison official will generally be justified in believing that the prisoner
> is in capable hands.  This follows naturally from the division of labor
> within a prison. Inmate health and safety is promoted by dividing
> responsibility for various aspects of inmate life among guards,
> administrators, physicians, and so on.  Holding a non-medical prison
> official liable in a case where a prisoner was under a physician's care
> would strain this division of labor.  Moreover, under such a regime,
> nonmedical officials could even have a perverse incentive not to

> delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill, 372 F.3d at 236. Courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, nonmedical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. See, e.g., id. at 236-37 (citing Durmer, 991 F.2d at 69); Garvey v. Martinez, No. 08- 2217, 2010 WL 569852, at *6-7 (M.D. Pa. Feb. 11, 2010); Hodge v. United States, No. 06-1622, 2007 WL 2571938, at *5-6 (M.D. Pa. Aug. 31, 2007). Moreover, a claim of a constitutional deprivation cannot be premised on the mere fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

With respect to nonmedical defendants like Yeingst and Long, Enright fails to establish a viable claim. Yeingst as warden, and Long as deputy warden, are not trained members of medical staff subject to liability for an Eighth Amendment claim. Moreover, the record reflects that Enright received immediate treatment for his diabetes once medical officials received the results of his blood test and diagnosed him with diabetes mellitus. Enright was placed on an insulin regimen, he underwent regular blood tests, was placed on medical watch, and was examined on multiple occasions. Because Enright was under the regular care of medical

experts, the nonmedical defendants were justified in believing that he was in capable hands.  See Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69.

Enright also appears to contend that Yeingst and Long, in their capacities as warden and deputy warden of the prison, were aware that he was dissatisfied with the medical treatment he was receiving for his diabetic condition, but failed to remedy the situation.  However, Enright fails to present any evidence that Yeingst and Long played an affirmative part in the administration of his medical treatment. Rather, he seeks to hold them liable based upon their supervisory roles as the warden and deputy warden of Perry County Prison.  Significantly, a civil rights claim cannot be premised on a theory of *respondeat superior*.  Rode, 845 F.2d at 1207.  Instead, a plaintiff must show that each named defendant was personally involved in the events or occurrences which underlie a claim.  See Rizzo v. Goode, 423 U.S. 362 (1976).  Simply making the warden and deputy warden aware of a medical issue is insufficient to impose liability.

Based on the foregoing, defendants Yeingst and Long are entitled to summary judgment on this claim.

## 2. *Confiscation of Cane*

Enright contends that defendants Yeingst and Long acted with deliberate indifference to his medical needs by confiscating his cane.  The court finds that Enright failed to exhaust his administrative remedies concerning the confiscation of his cane, the decision to confiscate the cane served the legitimate penological interest of promoting security and preventing Enright from using the cane to

assault other inmates, and defendant Long had no personal involvement in the confiscation of the cane.

### a.  Exhaustion of Administrative Review

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action.  See 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001).  The exhaustion requirement is mandatory, see Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

Courts have also imposed a procedural default component on the exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).  Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court.  See Spruill, 372 F.3d 218.  An "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 83-84 (2006).  Thus, the PLRA mandates that inmates

"properly" exhaust administrative remedies before filing suit in federal court. <u>Id.</u> at 92.

The Pennsylvania Department of Corrections has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. <u>See</u> 37 Pa. Code § 93.9(a); <u>see also</u> www.cor.state.pa.us, DOC Policies, Policy No. DC-ADM 804, Inmate Grievance System. DC-ADM 804 provides inmates with a three-tiered process for filing grievances and appeals to grievance responses. <u>Id.</u> After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. <u>Id.</u> This must occur within fifteen days after the events upon which the claims are based. <u>Id.</u> "The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim. The statement of facts shall include the date, approximate time and location of the event(s) that gave rise to the grievance. The inmate shall identify individuals directly involved in the event(s)." DC-ADM 804, § 1(A)(12). If the inmate was dissatisfied with the initial response to his grievance, the inmate may then file an appeal to the Facility Manager in writing, within fifteen (15) working days from the date of the initial review response. <u>Id.</u> An inmate who remained dissatisfied with the decision of the Facility Manager may then appeal to final review with the Chief of the Secretary's Office of Inmate Grievances and Appeals within fifteen (15) working days from the date of the Facility Manager's decision. <u>Id.</u> An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must

exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. See <u>Booth v. Churner</u>, 206 F.3d 289, 293 n. 2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process); <u>Ingram v. SCI Camp Hill</u>, 448 F. App'x 275, 279 (3d Cir. 2011) (same).

Courts have invariably held that affirmative misconduct by prison officials, designed to impede or prevent an inmate's attempts to exhaust, may render administrative remedies unavailable. See <u>Todd v. Benning</u>, 173 F. App'x 980, 982-83 (3d Cir. 2006) (expressing approval of Eighth Circuit's holding in <u>Miller v. Norris</u>, 247 F.3d 736 (8th Cir. 2001)) that administrative remedies were not available where prison officials "purportedly prevented prisoner from employing the prison's grievance system"). Examples of affirmative misconduct on the part of prison officials include: (1) threatening a prisoner in an attempt to thwart the prisoner's attempts to exhaust, <u>see</u> <u>Harcum v. Shaffer</u>, No. 06-5326, 2007 WL 4167161, at *5 (E.D. Pa. Nov. 21, 2007) (finding administrative remedies unavailable where prison officials threatened plaintiff with "opposition to his future prerelease application, parole, or outside work detail if he did not withdraw his grievance"), (2) refusing to provide appropriate grievance forms in response to inmate inquiries, <u>see</u> <u>Mitchell v. Horn</u>, 318 F3d 523, 529 (3d Cir. 2003), (3) advising an inmate that his or her situation does not require a grievance, <u>see</u> <u>Brown v. Croak</u>, 312 F.3d 109, 111 (3d Cir. 2002) (finding that administrative remedies were unavailable to plaintiff who had been advised by prison official that he must wait until the end of the prison's investigation before filing a grievance), and (4) failing to file or respond to a

prisoner's grievances, see Camp v. Brennan, 219 F.3d 279, 280-81 (3d Cir. 2000) (finding that administrative remedies were unavailable where prison officials refused to file plaintiff's grievances regarding their coworkers). The Third Circuit has found that an institution "rendered its administrative remedies unavailable to [an inmate] when it failed to timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim." Robinson v. Superintendent Rockview SCI, 831 F.3d 148, 154 (3d Cir. 2016).

Enright acknowledges that he did not exhaust the available administrative remedies available to him at Perry County Prison concerning the confiscation of his cane. (Doc. 108 at 16-18). In an attempt to excuse the exhaustion requirement, Enright asserts that he did not avail himself of these remedies because he was transferred from Perry County Prison to a different facility. Id. However, the Third Circuit has found that the transfer of an inmate to another facility does not excuse the PLRA's exhaustion requirement. See Williamson v. Wexford Health Sources, Inc., 131 F. App'x 888, 890 (3d Cir. 2005) (affirming grant of summary judgment for failure to exhaust against plaintiff where plaintiff was transferred to a different prison after filing administrative claim, which plaintiff did not appeal); In re Bayside Prison Litigation, 2008 WL 2387324, *4 (D. N.J. May 19, 2008). See also Napier v. Laurel Cnty., Ky., 636 F.3d 218, 223 (6th Cir. 2011) ("[g]enerally, '[t]he transfer of a prisoner from one facility to another does not render the grievance procedures at the transferor facility 'unavailable' for the purposes of exhaustion'") (citations omitted). Furthermore, the record reflects that Enright remained at Perry County Prison for nearly ten months following the return of his cane, but

nonetheless failed to complete the grievance process concerning the confiscation of his cane. Enright further claims that, while housed at Perry County Prison, he "felt as though inmates were strongly discouraged from filing grievances." (Doc. 108 at 18; Doc. 107 ¶¶ 12, 16). He also states that he "remembers" filing a grievance regarding the confiscation of his cane. (Doc. 107 ¶ 16). However, Enright sets forth absolutely no evidence to substantiate these claims. Enright fails to produce an actual grievance, and fails to set forth any evidence that officials at Perry County Prison obstructed his attempt to exhaust the administrative remedy process. Nor does he present any facts or evidence that his efforts to utilize the administrative review process were impeded in any manner.

It is undisputed that Perry County Prison had administrative grievance procedures in place which Enright could have used to challenge the confiscation of his cane. It is also entirely undisputed that Enright never availed himself of these procedures to challenge the confiscation of his cane before proceeding to federal court. See Ahmed v. Dragovich, 297 F.3d 201 (3d Cir. 2002) (exhaustion requires completion of the entire administrative remedy process *prior* to filing suit) (emphasis added). Further, Enright's transfer from Perry County Prison, standing alone, does not excuse his failure to exhaust these administrative remedies. See Williamson, 131 F. App'x at 890; In re Bayside Prison Litigation, 2008 WL 2387324, at *4. Therefore, as a threshold matter, Enright's claim regarding the confiscation of his cane fails on administrative exhaustion grounds.

Beyond this threshold concern, there are separate, and independent, substantive flaws with Enright's claims against defendants Yeingst and Long regarding the confiscation of his cane. These deficiencies are discussed below.

### b.  Claim against defendant Yeingst

The record reflects that Enright's cane was temporarily confiscated pursuant to a prison policy that is rationally related to a legitimate government interest that serves a legitimate penological need: namely, maintaining institutional security and promoting inmate safety because Enright was believed to be a security threat. See Rhodes v. Chapman, 452 U.S. 337, 346 (1981)) ("[r]estraints on an inmate do not violate the [Eighth] amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'"). It is undisputed that Enright walked up behind another inmate, raised his cane in the air, and motioned as if to use the cane to strike the inmate. (Doc. 97 ¶¶ 17-24, 36; Doc. 107 ¶¶ 17-23). The record establishes that the observing officer viewed Enright's conduct as posing a security threat, since it suggested that Enright was capable of and willing to use the cane to assault another inmate. (Id.) Enright does not dispute that he walked up behind another inmate and motioned as if to strike the inmate with his cane. (See Doc. 107 ¶ 19) (Enright "agree[s] that he made the motion, however, he did not have the intent to actually strike an inmate."). Instead, he claims that his actions were intended as a "joke" and defendant Yeingst was aware that he was acting in a joking manner. (Doc. 107 ¶ 19; Doc. 108 at 15).

Enright offers no evidence to refute the Perry County defendants' contention that the cane was confiscated for legitimate, penological reasons. The Perry County defendants have sufficiently established that Enright's cane was not confiscated to deprive him of needed care or to cause him undue suffering. The record reflects that once his cane was confiscated, Enright was still permitted to use his cane outside of the cell block, notwithstanding the security concerns of the prison. The record further reflects that the cane was returned to Enright on August 9, 2011. Thus, Enright's cane was only temporarily withheld from him from July 30, 2011 until August 9, 2011. Absent any facts that would suggest deliberate indifference to a serious medical need, summary judgment will be granted in favor of defendant Yeingst on this claim. See Robinson v. Catlett, 725 F.Supp.2d 1203, 1209 (S.D. Cal. 2010) (granting summary judgment to defendants on plaintiff's claim that defendants wrongfully confiscated his cane where the undisputed facts showed that plaintiff had attempted to strike another inmate with his cane); Kwanzaa v. Brown, 2009 WL 4139393 (D.N.J. 2009) (granting summary judgment to defendants on plaintiff's claim that they had wrongfully confiscated his cane when plaintiff did not dispute that he had threatened to physically harm defendants).

### c.      Claim against defendant Long

The record reflects that Deputy Warden Long had no involvement in the decision to confiscate Enright's cane. (Statement of Undisputed Facts at ¶ 25). Enright has failed to set forth any evidence establishing that Deputy Warden Long was personally involved in the decision to confiscate the cane from him. Federal civil rights claims brought under § 1983 cannot be premised on a theory of

*respondeat superior*.  <u>Rode</u>, 845 F.2d at 1207.  Rather, each named defendant must

be shown, *via* the complaint's allegations, to have been personally involved in the

events or occurrences which underlie a claim.  <u>See</u> <u>Rizzo v. Goode</u>, 423 U.S. 362

(1976); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077 (3d Cir. 1976).  As

explained in <u>Rode</u>:

> A defendant in a civil rights action must have personal involvement in
> the alleged wrongs. . . . [P]ersonal involvement can be shown through
> allegations of personal direction or of actual knowledge and
> acquiescence.  Allegations of participation or actual knowledge and
> acquiescence, however, must be made with appropriate particularity.

<u>Rode</u>, 845 F.2d at 1207.

As it pertains to the confiscation of Enright's cane, the records show that the

decision to confiscate the cane was made by Warden Yeingst.  Deputy Warden Long

was not involved in the confiscation of Enright's cane.  Therefore, Enright has failed

to meet his burden with respect to this claim and, as a result, summary judgment

will be granted in favor of defendant Long.

### 3. *Premature Discharge from Hospital*

Enright next contends that defendants Yeingst and Long sought to have him

prematurely discharged from the hospital.  Enright claims that "he heard

conversations where Warden Yiengst [sic] was displeased with Mr. Enright's length

of stay, as it required paying correctional officers to stay and watch him." (Doc. 108

at 22).  Enright fails to offer any evidence to support this claim.  The uncontroverted

medical records plainly indicate that Enright's treating physicians discharged him

from the hospital because he completed his rehabilitation, and they believed he was

ready to be discharged.  (<u>Id.</u> at ¶¶ 77-78).  The party adverse to summary judgment

must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). Enright has failed to meet this burden in that he has failed to create a genuine issue of fact as to whether defendants Yeingst and Long were involved in the decision to discharge him from the hospital.

Consequently, the Perry County defendants are entitled to summary judgment on this claim.

### B. <u>Monell</u> Liability

The Perry County defendants assert that Enright fails to establish a claim for municipal liability under <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658 (1978). (Doc. 60 at 8-10). A municipality may be held liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of constitutional rights or 'causes' a person 'to be subjected' to such deprivation." <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (quoting <u>Monell</u>, 436 U.S. at 692). Thus, a plaintiff seeking to impose constitutional liability on a municipality must meet the difficult burden of proving that "action pursuant to official municipal policy" caused their injury. <u>Monell</u>, 436 U.S. at 691, 694. This requires the plaintiff to identify an official or unofficial municipal policy—including "decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law," <u>Connick</u>, 563 U.S. at 61 (citations omitted), and demonstrate that said policy was the "moving force" behind his injury, <u>Berg v. Cty.</u>

of Allegheny, 219 F.3d 261, 275-76 (3d Cir. 2000) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).

Additionally, the absence of a policy may provide the basis for a Monell claim if sufficiently pled. In Natale, the Third Circuit determined that a prison with "no policy ensuring that an inmate having need of medication for a serious medical condition would be given that medication during the first 72 hours of . . . incarceration" was a "'particular[ly] glaring omission' in a program of medical care." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584-85 (3d Cir. 2003) (quoting Brown, 520 U.S. at 410-11).

Enright asserts Monell claims against the Perry County defendants based on the following: (1) an alleged policy whereby prison guards serve as the "gatekeepers" to medical staff; (2) an alleged inadequate and/or nonexistent policy for addressing inmate medical needs during times when no PrimeCare medical official is present at the facility; and, (3) an alleged insufficient policy for addressing diabetic inmates' needs

### 1. *Guards Serving as "Gatekeepers" to the Medical Staff*

To establish liability under Monell, a plaintiff must identify the challenged policy or custom, attribute it to the municipality itself, and show a causal link between the execution of the policy or custom and the injury suffered. Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). The record establishes that Perry County Prison has a sick call policy which requires correctional officers to submit all written sick call forms to PrimeCare officials for further handling, without any discretion over the decision as to whether the inmate would be seen by

30

medical staff.  (Doc. 97 ¶ 8; Doc. 107 ¶ 8).  Enright admits that he was aware of this policy and the sick call policy is included in the inmate handbook that all inmates receive.  (Doc. 97 ¶ 9; Doc. 107 ¶ 9).  Enright also admits that he never submitted a sick call form to correctional officers requesting to see medical for the alleged symptoms he experienced.  (Doc. 97 at ¶¶ 44, 47-48; Doc. 107 ¶ 44).  Because Enright admittedly did not comply with the sick call policy, he has failed to establish that the policy was a cause of his harm.

### 2.    *The "Lack of Staffing" Policy*

The contract between Perry County and PrimeCare states that "all professional medical services providers shall be on-call, twenty-four (24) hours per day, seven (7) days per week."  (Doc. 97 ¶ 91; Doc. 107 ¶ 91).  The record reflects that a phone tree is posted throughout Perry County Prison which lists the various PrimeCare medical providers to call with non-emergency inmate medical issues that occur when PrimeCare officials are not present at the facility.  (Doc. 97 ¶ 92; Doc. 107 ¶ 92).  Correctional officers are instructed to call 911 in the event of a medical emergency.  (Doc. 97 ¶ 93; Doc. 107 ¶ 93).  The uncontroverted evidence establishes that correctional officers at Perry County Prison have the ability to contact a medical official for consultation 24 hours a day, 7 days per week, whether or not a PrimeCare employee is at the facility.  (Doc. 97 ¶ 94; Doc. 107 ¶ 94; Doc. 107-11 at 3, Contract).  The Perry County-PrimeCare contract states that "all professional medical services providers shall be available on-call, twenty-four (24) hours per day, seven (7) days per week.  Company medical personnel shall not

typically be required to appear on-site at Facility on or during Federal Holidays." (Doc. 107-11 at 3). Enright failed to produce any evidence that this policy, which ensured that inmates had access to medical care and consultation around-the-clock, was the cause of his harm.

Enright further contends that this policy "allowed the Warden to have too much discretion in having additional members on staff." (Doc. 108 at 24). However, the undisputed evidence establishes that a PrimeCare official was responsible for the scheduling of medical staff at the prison, not Warden Yeingst. (Doc. 97 ¶ 89). The Perry County-PrimeCare contract specifically provides that "[PrimeCare] Company agrees to staff the Medical Department at the Facility with sufficient medical, nursing and ancillary-staff." (Doc. 107-11 at 3). Enright failed to produce any evidence to dispute this fact.

### 3. *Policy Concerning Diabetic Inmates*

Pursuant to Perry County Prison policy, diabetic inmates test their own blood sugar using calibrated glucometers, under the supervision of correctional officers or medical officials. (Doc. 97 ¶¶ 81-84). Inmates administer insulin at a pre-established dosage in accordance with a sliding scale set by PrimeCare. (Id. at ¶¶ 85-87). Enright failed to produce any evidence that the Perry County Prison policy concerning diabetic inmates was insufficient. Furthermore, Enright began testing his blood sugar immediately upon his return from the hospital. Thus, Enright failed to establish that the Perry County Prison policy regarding diabetic inmates was a causal factor in any alleged harm that resulted in his hospitalization.

## C.     Claims against Commissioners Benner, Naylor, and Rudy

As stated *supra*, a plaintiff must establish that each defendant was personally involved in the act or acts that the plaintiff claims violated his rights.  Rode, 845 F.2d at 1207.   Supervisors cannot be liable under § 1983 on the traditional standards of *respondeat superior*.  Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010).  Instead, there are two theories of supervisory liability that are applicable to § 1983 claims: (1) "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations"; and (2) policymakers may also be liable under § 1983 "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).

There is no evidence that defendants Benner, Naylor, and Rudy were involved in the day to day operations of the prison.  Enright contends that defendants Benner, Naylor, and Rudy are members of the prison board and thus responsible for creating the policies of Perry County Prison, or allowing their enforcement.  Enright failed to produce any evidence that the alleged violations of his constitutional rights resulted from a policy or procedure enacted or ratified by the Prison Board.  The evidence of record demonstrates that no one at Perry County Prison ever spoke to any Prison Board member about Enright's medical issues.  (Doc. 97 ¶ 70).  A party opposing summary judgment must come forth with

"affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas</u>, 331 F. Supp. 2d at 315; FED. R. CIV. P. 56(e). Enright has not produced any evidence to establish that these Perry County Prison Board members acted with deliberate indifference in passing policies that violated his constitutional rights. For these reasons, Enright's attempt to establish liability against these Prison Board members fails.

### D. Qualified Immunity

The individual Perry County defendants invoke the defense of qualified immunity in their summary judgment motion.[3] (Doc. 96 ¶ 16; Doc. 103 at 29-30). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from

---

[3] Qualified immunity is only available to government officials sued in their individual capacities; municipal entities and agencies, such as Perry County, cannot, and did not, claim the doctrine's protection. <u>Carver v. Foerster</u>, 102 F.3d 96, 102 (3d Cir. 1996) (citing <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980)); <u>Duran v. Merline</u>, 923 F. Supp. 2d 702, 718 (D.N.J. 2013).

liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first). As set forth supra, there are no genuine issues of fact as to whether a constitutional right has been violated. Therefore, the Perry County defendants sued in their individual capacities are protected by qualified immunity.

## V.    **Facts Pertinent to Medical Defendants'**

During the time period relevant to the allegations of the second amended complaint, PrimeCare was contracted with Perry County to provide medical services to inmates incarcerated in the Perry County Prison. (Doc. 101, Statement of Material Facts, ¶ 4; Doc. 101, Exhibit A, PrimeCare-Perry County Contract; Doc. 109, Counterstatement of Material Facts, ¶ 4). Bethany Dressler Heckman is a licensed practical nurse who was employed by PrimeCare to provide medical services to inmates at Perry County Prison during all relevant times. (Doc. 101 ¶ 5; Doc. 101, Exhibit B, Bethany Heckman Dep. at 6:2, 14:10-11; Doc. 109 ¶ 5). Thomas

Weber is the chief executive officer of PrimeCare. (Doc. 101 ¶ 6; Doc. 101, Exhibit C, Thomas Weber Dep. at p. 5:13-19; Doc. 109 ¶ 6).

On August 25, 2010, prior to his incarceration at Perry County Prison, Enright was in a motor vehicle accident in which he sustained a comminuted fracture of his left tibia, requiring surgery for placement of an intramedullary rod. (Doc. 101 ¶ 7; Doc. 101, Exhibit D, Bermuda Hospital at pp. 35-36, 41; Doc. 109 ¶ 7).

On or about June 27, 2011, Enright was committed to Perry County Prison in relation to charges of possession of child pornography and failure to register as a sex offender. (Doc. 101 ¶ 8; Doc. 101, Exhibit E, Booking Observation Report, PCM3-4; Doc. 101, Mental Health Evaluation, 7/5/11, PCM 89; Doc. 101, Exhibit F, Justin Enright Dep. at 17:4-22, 18:9-11; Doc. 109 ¶ 8). Prior to his incarceration at Perry County Prison, Enright was never diagnosed with diabetes by any medical provider. (Doc. 101 ¶ 9; Doc. 101, Exhibit F, Enright Dep. at 33:7-8; Doc. 109 ¶ 9). During booking on June 27, 2011, Enright confirmed that he did not have a diagnosis of diabetes. (Doc. 101 ¶ 10; Doc. 101, Exhibit E, Booking Observation Report, PCM3-4; Doc. 109 ¶ 10).

On June 28, 2011, Enright went through medical intake screening and was medically assessed by defendant Nurse Heckman. (Doc. 101 ¶ 11; Doc. 101, Exhibit E, Receiving Screening/Health Assessment, PCM191-192; Doc. 109 ¶ 11). Defendant Heckman noted that Enright had hip and leg pain caused by a motor vehicle accident. (Id.) During medical intake, Enright did not reveal that he had a current diagnosis of diabetes. (Doc. 101 ¶ 12; Doc. 101, Exhibit E, Receiving

Screening/Health Assessment, PCM191- 192; Doc. 109 ¶ 12). Aside from the broken leg, Enright had no other medical conditions at the time. (Doc. 101 ¶ 13; Doc. 101, Exhibit F, Enright Dep. at 22:14-17; Doc. 109 ¶ 13). Enright openly acknowledges he did not have diabetes at this point. (Doc. 101 ¶ 14; Doc. 101, Exhibit F, Enright Dep. at 33:7-8; Doc. 109 ¶ 14). However, Enright contends that he informed medical staff that he had a family history of diabetes. (Doc. 109 ¶ 9).

Enright was permitted to use a cane to aid him in walking. (Doc. 101 ¶ 15; Doc. 101, Exhibit E, Dispensary Card, 6/28/11, PCM37; Doc. 109 ¶ 15). Enright's medication, Celexa, Remeron, and Ibuprofen, was verified by phone. (Doc. 101 ¶ 16; Doc. 101, Exhibit E, Dispensary Card, 6/28/11, PCM37; Doc. 109 ¶ 16). Enright signed a Notification of Medical Services form, which informed him that he could sign up for a Sick Call if he needed medical attention. (Doc. 101 ¶ 17; Doc. 101, Exhibit E, Notification of Medical Services, PCM99; Doc. 109 ¶ 17).

On June 29, 2011, Enright was prescribed Ibuprofen 600mg, three times per day as needed, for 30 days. (Doc. 101 ¶ 18; Doc. 101, Exhibit E, Dispensary Card, 6/29/11, PCM37; Doc. 109 ¶ 18). Enright acknowledges that he received pain medication for his leg. (Doc. 101 ¶ 19; Doc. 101, Exhibit F, Enright Dep. at 35:2-19; Doc. 109 ¶ 19). As of July 5, 2011, Enright continued to use his cane to ambulate. (Doc. 101 ¶ 20; Exhibit E, Mental Health Evaluation, 7/5/11, PCM89; Doc. 109 ¶ 20).

On July 14, 2011, Enright underwent a physical examination performed by defendant Nurse Heckman. (Doc. 101 ¶ 21; Doc. 109 ¶ 21). On July 14, 2011, Enright was prescribed Tramadol 50mg for pain, three times per day as needed for

90 days, and Ibuprofen 600mg, three times per day as needed for 90 days. (Doc. 101 ¶ 22; Doc. 101, Exhibit E, Dispensary Card, 7/14/11, PCM37; Doc. 109 ¶ 22).

During her deposition, defendant Nurse Heckman recalled the incident when Enright used his cane as a weapon, which was a security issue. (Doc. 101 ¶ 25; Doc. 101, Exhibit B, Heckman Dep. at 42:15-43:4). On or about August 2, 2011, Enright's cane was taken away by correctional staff because he made a threatening motion. (Doc. 101 ¶ 26; Doc. 101, Exhibit E, Mental Health Evaluation, 8/2/11, PCM91; Doc. 109 ¶ 26). However, Enright was still permitted to use the cane outside of the cell block. (Id.) On August 9, 2011, Enright's cane was returned to him for use inside and outside the cell block. (Doc. 101 ¶ 28; Doc. 101, Exhibit G, Incident Report, 7/30/11; Doc. 101, Exhibit F, Enright Dep. at 102:25-103:3; Doc. 109 ¶ 28).

On September 21, 2011, a physician assistant evaluated Enright. (Doc. 101 ¶ 29; Doc. 109 ¶ 29). Enright complained of leg pain and requested renewal of prescriptions of Tramadol and Ibuprofen. (Id.) The physician assistant renewed his prescriptions for Tramadol and Ibuprofen. (Doc. 101 ¶ 29; Doc. 101, Exhibit E, Dispensary Card, 9/21/11, PCM38-39; Doc. 109 ¶ 29).

On October 8, 2011, defendant Heckman treated Enright, at which time he requested knee support. (Doc. 101 ¶ 30; Doc. 109 ¶ 30). Defendant Nurse Heckman placed Enright on line to see a physician assistant. (Doc. 101 ¶ 30; Doc. 101, Exhibit E, Dispensary Card, 10/8/11, PCM39; Doc. 109 ¶ 30). On October 12, 2011, a physician assistant approved a Neoprene knee brace for Enright. (Doc. 101 ¶ 31; Doc. 101, Exhibit E, Dispensary Card, 10/12/11, PCM39; Doc. 109 ¶ 31).

On December 25, 2011, a correctional officer was informed that Enright seemed confused and was showering about once per week. (Doc. 101 ¶ 32; Doc. 109 ¶ 32). The correctional officer notified his lieutenant, who placed Enright on line to see medical. (Doc. 101 ¶ 32; Doc. 101, Exhibit G, Perry County Prison Incident Report, 12/25/11; Doc. 109 ¶ 32).

On Christmas Day, December 25, 2011, defendant Heckman was off of work due to the holiday, (Doc. 101 ¶ 33; Doc. 101, Exhibit B, Heckman Dep. at 76:15-16; Doc. 109 ¶ 33), but she returned to work on December 28, 2011. (Doc. 101 ¶ 34; Doc. 101, Exhibit B, Heckman Dep. at 51:24-53:4; Doc. 109 ¶ 34). On December 28, 2011, defendant Nurse Heckman became aware of the report that Enright had been confused and was showering once per week. (Doc. 101 ¶ 35; Doc. 101, Exhibit E, Dispensary Card, 12/28/11, PCM40; Doc. 101, Exhibit B, Heckman Dep. at 53:2-4; Doc. 109 ¶ 35). As a result, on the same date, defendant Heckman referred Enright to the physician assistant. (Doc. 101 ¶ 36; Doc. 101, Exhibit E, Dispensary Card, 12/28/11, PCM40; Doc. 109 ¶ 36). On December 28, 2011, the physician assistant evaluated Enright and ordered lab work, including a comprehensive metabolic panel, a complete blood count, and a thyroid panel. (Doc. 101 ¶ 37; Doc. 109 ¶ 37). Enright was also advised to follow up with mental health the next day. (Doc. 101 ¶ 37; Doc. 109 ¶ 37). On December 30, 2011, Enright underwent the ordered lab tests. (Doc. 101 ¶ 39; Doc. 101, Exhibit E, BioReference Laboratories Report, 12/30/11, PCM32-33; Doc. 109 ¶ 39). On December 31, 2011, the lab results were sent to the prison. (Id.)

Enright contends that defendant Heckman was aware of his condition on December 30, 2011, but failed to do anything to ensure his care while she was off of work from December 30, 2011 until January 2, 2011.[4] (Doc. 109 ¶ 112). Defendant Heckman maintains that she was not aware on December 30, 2011 that Enright was diabetic because the lab test was not performed until December 30, 2011, and the lab report was not generated until December 31, 2011. (Doc. 112 ¶ 112).

On Monday, January 2, 2012, a nurse filling in for defendant Nurse Heckman, called the physician assistant to report the results of Enright's fasting blood glucose level. (Doc. 101 ¶ 41; Doc. 101, Exhibit E, Dispensary Card, 1/2/12, PCM41; Doc. 101, Exhibit B, Heckman Dep. at 75:13-17; Doc. 109 ¶ 41). The physician assistant prescribed Zantac and ordered that Enright be placed on a diabetic diet, inclusive of a snack bag at bedtime. (Doc. 101 ¶ 42; Doc. 109 ¶ 42). Additionally, a repeat urinalysis dip test was to be performed in five days. (Doc. 101 ¶ 42; Doc. 101, Exhibit E, Dispensary Card, 1/2/12, PCM41; Doc. 101, Medical Diet Order, PCM55; Doc. 109 ¶ 42).

Enright was educated on how to give himself insulin. (Doc. 101 ¶ 43; Doc. 101, Exhibit E, Dispensary Card, 1/2/12, PCM41; Doc. 109 ¶ 43). Inmates obtained their blood sugar reading themselves using a glucometer. (Doc. 101 ¶ 44; Doc. 101, Exhibit B, Heckman Dep. at 81:5-7, 85:13-86:4, 118:24-119:22; Doc. 109 ¶ 44). If insulin was indicated pursuant to the sliding scale set forth on the form, the inmate

---

[4] December 31, 2011 was a Saturday, and January 1, 2012 was a Sunday. (Doc. 101 ¶ 40; Doc. 109 ¶ 40).

would administer his own insulin. (Id.) The glucometer was automatically calibrated after each use. (Doc. 101 ¶ 45; Exhibit B, Heckman Dep. at 117:22-118:5). Enright was escorted the medical room each time to use the glucometer and receive insulin. (Doc. 101 ¶ 46; Exhibit F, Enright Dep. at 92:17-23; Doc. 109 ¶ 46). Enright contends that PrimeCare and prison staff forced him to treat himself and to use equipment that did not always work properly. (Doc. 109 ¶ 113).

On January 2, 2012, Enright underwent a urinalysis test. (Doc. 101 ¶ 47; Doc. 101, Exhibit E, Chemstrip 9 Urine Test, PCM5; Doc. 109 ¶ 47). Enright began receiving treatment for diabetes every day on January 2, 2012. (Doc. 101 ¶ 48; Doc. 101, Exhibit E, Dispensary Card, 1/2/12, PCM41; Diabetic Record Sheets, PCM10-30).

On January 4, 2012, Enright was evaluated by the physician assistant and, for the first time, Enright was diagnosed with insulin-dependent diabetes mellitus. (Doc. 101 ¶ 49; Doc. 101, Exhibit E, Dispensary Card, 1/4/12, PCM41-42; Doc. 101 ¶¶ 9, 49). The physician assistant ordered Accuchecks four times per day and insulin dispensed in accordance with the sliding scale. (Doc. 101 ¶ 50; Doc. 109 ¶ 50). Enright was also placed on a 30-minute watch, his vital signs were to be taken four times per week, and he was to follow up in one week. (Doc. 101 ¶ 50; Doc. 101, Exhibit E, Dispensary Card, 1/4/12, PCM41-42; Doc. 109 ¶ 50). The parties dispute whether Enright was checked every 30 minutes by correctional staff. (Doc. 101 ¶ 51; Doc. 101, Exhibit E, Perry County Prison Inmate Observation, PCM108-111; Doc. 109 ¶ 51).

On January 5, 2012, at 6:12 a.m., Enright's blood sugar level was taken and he was administered insulin accordingly. (Doc. 101 ¶ 52; Doc. 101, Exhibit E, Diabetic Record Sheet, 1/5/12, PCM10-27; Doc. 101 ¶ 52). On January 5, 2012, at approximately 11:20 a.m., Enright was brought to medical with shortness of breath and evaluated by a nurse. (Doc. 101 ¶ 53). The nurse noted that he was disoriented but able to follow verbal commands. (Doc. 101 ¶ 53; Doc. 101, Exhibit E, Dispensary Card, 1/5/12, PCM42). Enright contends that he was in a constant state of confusion from his untreated diabetes since November of 2011. (Doc. 109 ¶ 53). The nurse placed a call to the physician assistant who ordered a urine test and, if ketones were elevated, Enright was to be sent to the emergency room *via* 911. (Doc. 101 ¶ 54; Doc. 109 ¶ 54). Enright's urine was tested and an elevated ketone reading was revealed. (Doc. 101 ¶ 55; Doc. 101, Exhibit E, Chemstrip 9 Urine Test, PCM6; Dispensary Card, 1/5/12, PCM42; Doc. 109 ¶ 55). The nurse called 911 and Enright was sent *via* ambulance to Carlisle Regional Medical Center ("CRMC"). (Doc. 101 ¶ 56; Doc. 101, Exhibit E, Dispensary Card, 1/5/12, PCM42; Doc. 109 ¶ 56).

The Inmate Observation sheet for January 5, 2012 reveals, in pertinent part, the following observations of Enright:

7:08 a.m. – laying on bunk, said he is ok
7:26 a.m. – appears asleep, breathing
8:44 a.m. – going to the bathroom
9:06 a.m. – awake laying on bunk
9:36 a.m. – awake standing [illegible word] OK
9:57 a.m. – sitting at table 10:27 a.m. – not feeling well – sent to intake
11:15 a.m. – in intake waiting for medical transport
11:56 a.m. – on medical transport
12:30 p.m. – med transport
12:55 p.m. – at hospital

(Doc. 101 ¶ 57; Doc. 101, Exhibit E, Perry County Prison Inmate Observation, PCM110; Doc. 109 ¶ 57).

At CRMC, Enright was diagnosed with diabetic ketoacidosis. (Doc. 101 ¶ 58; Doc. 101, Exhibit H, CRMC Consultation at pp. 7-8; Doc. 109 ¶ 58). Enright ultimately lapsed into a diabetic coma, developed foot drop in his left leg, an ulcer, and a scar on his lip. (Doc. 101 ¶ 59; Doc. 101, Exhibit F, Enright Dep. at 45:23-47:4; Doc. 109 ¶ 115).

On January 9, 2012, evaluation notes at CRMC (Doc. 101 ¶ 60) observe a scar and abrasion on Enright's lip. (Doc. 101 ¶ 60). It was also noted that Enright was alert, awake and oriented. (Doc. 101 ¶ 60; Doc. 101, Exhibit H, CRMC Consultation at pp. 9-10). On January 11, 2012, Enright began rehabilitation. (Doc. 101 ¶ 61; Doc. 101, Exhibit H, CRMC Consultation, PCM205-207). On January 12, 2012, Enright began occupational therapy and engaged in various activities such as completing puzzles. (Doc. 101 ¶ 62; Doc. 101, Exhibit F, Enright Dep. at 47:15-25).

On January 12, 2012, it was noted that Enright was alert and oriented, and he had an ulcer on his left foot. (Doc. 101 ¶ 63; Doc. 101, Exhibit H, CRMC History & Physical, pp. 395-96). On January 13, 2012, Enright underwent further evaluation at CRMC. (Doc. 101 ¶ 64). It was noted that Enright was recently diagnosed with ketoacidosis and left foot drop. (Doc. 101 ¶ 64). Enright reported that once he regained consciousness, he noticed his left foot flopping. (Doc. 101 ¶ 64). A neurological examination of Enright revealed that he was oriented to time and place, his speech was fluent with good comprehension and expression, he exhibited

43

no dysarthria or dysphasia, and visual acuity, hearing, and sensation were normal. (Doc. 101 ¶ 64; Doc. 101, Exhibit H, CRMC Consultation, PCM205-207).

A January 15, 2012 progress note from Penn Rehabilitation Associates, P.C. ("PRA") reflects that Enright was alert. (Doc. 101 ¶ 65; Doc. 101, Exhibit I, Penn Rehabilitation Associates, PCM212). On January 16, 2012, Enright's communications and cognition were noted as being intact. (Doc. 101 ¶ 66; Doc. 101, Exhibit H, CRMC Weekly Team Conference Summary, PCM251-252). Enright's discharge instructions included a diabetic diet and a molded ankle/foot orthotic. (Doc. 101 ¶ 67; Doc. 101, Exhibit H, CRMC Discharge Instructions at p. 571).

Enright underwent a physical therapy evaluation by Celtic Healthcare and a comprehensive assessment was performed. (Doc. 101 ¶ 68). A wheeled walker and short leg brace were recommended. (Doc. 101 ¶ 68). Additionally, Enright was shown home exercises. (Doc. 101 ¶ 68; Doc. 101, Exhibit J, Celtic Healthcare at p. 47). Enright was continuously treated at CRMC until his discharge on January 17, 2012. (Doc. 101 ¶ 69; Doc. 101, Exhibit H, CRMC Physician Orders, PCM244).

Enright contends that he was not able to fully comprehend what he experienced until sometime after his January 17, 2012 discharge from the hospital. (Doc. 109 ¶¶ 59-69).

On January 17, 2012, a nurse at Perry County Prison received a verbal report from a nurse at CRMC rehabilitation. (Doc. 101 ¶ 70; Doc. 109 ¶ 70). The Perry County Prison nurse was informed that Enright was able to bear weight as tolerated with a walker, a brace was ordered, and exercises were being reviewed

with Enright.  (Id.)  The nurse was also informed about treatment for Enright's ulcer.  (Doc. 101 ¶ 70; Doc. 101, Exhibit E, Dispensary Card, 1/17/12, PCM43; Doc. 109 ¶ 70).

Upon return to Perry County Prison, the medical department treated Enright.  (Doc. 101 ¶ 71; Doc. 109 ¶ 71).  Medical staff continued the medication prescribed by the hospital, other than Zantac, in addition to prescriptions of Prilosec, Lisinopril, and Augmentin.  (Id.)  Medical staff continued insulin orders, ordered daily wound care of Enright's left foot, and ordered labs.  (Doc. 101 ¶ 71; Doc. 101, Exhibit E, Dispensary Card, 1/17/12, PCM43; Doc. 109 ¶ 71).  Additionally, Enright's diabetic diet was continued.  (Doc. 101 ¶ 72; Doc. 101, Exhibit E, Medical Diet Order, PCM56; Doc. 109 ¶ 72).

Enright underwent physical therapy sessions with Celtic once per week. (Doc. 101 ¶ 73; Doc. 101, Exhibit F, Enright Dep. at 57:11-21' Doc. 109 ¶ 73).  On January 25, 2012, a physician assistant treated Enright and noted that his blood sugar was controlled, he had no further problems with cognition or alertness, and he walked with a walker.  (Doc. 101 ¶ 74; Doc. 101, Exhibit E, Dispensary Card, 1/25/12, PCM44-46; Doc. 109 ¶ 74).  On January 26, 2012, it was again noted that Enright was using his walker. (Doc. 101 ¶ 75; Doc. 101, Exhibit E, Mental Health Evaluation, 1/26/12, PCM96; Doc. 109 ¶ 75).

On January 31, 2012, Enright was scheduled for a February 3, 2012 appointment with Hanger Orthotics & Prosthetics for fitting of his foot brace.  (Doc. 101 ¶ 77; Doc. 109 ¶ 77).  On February 1, 2012, defendant Nurse Heckman spoke

with someone from Celtic Healthcare with regard to Enright's foot brace. (Doc. 101 ¶ 78; Doc. 109 ¶ 78). Defendant Nurse Heckman informed the Celtic Healthcare personnel of Enright's upcoming appointment on February 3, 2012 with Hanger Orthotics & Prosthetics and that Enright was using a rolling walker. (Doc. 101 ¶ 78; Doc. 101, Exhibit E, Dispensary Card, 2/1/12, PCM46; Doc. 109 ¶ 78). On February 3, 2012, Enright was transported to Hanger Orthotics & Prosthetics to be fitted for a brace. (Doc. 101 ¶ 79; Doc. 101, Exhibit E, Consultation Appointment/Emergency Room Referral, PCM9; Doc. 109 ¶ 79).

On February 6, 2012, Enright was seen by Celtic Healthcare. (Doc. 101 ¶ 80; Doc. 109 ¶ 80). It was noted that Enright was ambulating safely with a wheeled walker and short leg brace with metal uprights and rocker bottom sole. (Id.) It was also noted that Enright was not compliant with use of a Biomechanical Ankle Platform System board and prescribed exercises. (Id.) Enright was discharged from physical therapy at Celtic Healthcare. (Id.) Defendant Nurse Heckman approved Enright's brace and she was informed that no further visits were needed. (Doc. 101 ¶ 80; Doc. 101, Exhibit J, Celtic Healthcare at p. 8; Doc. 101, Exhibit E, Dispensary Card, 2/6/12, PCM46; Doc. 109 ¶ 80).

When the physical therapy concluded, Enright was shown different exercises that he could do on his own. (Doc. 101 ¶ 81; Doc. 101, Exhibit F, Enright Dep. at 58:6-11; Doc. 109 ¶ 81). Enright had the brace for the rest of the time he was in the Perry County Prison. (Doc. 101 ¶ 82; Doc. 101, Exhibit F, Enright Dep. at 59:6-8; Doc. 109 ¶ 82). On March 22, 2012, Enright had possession of and was using his

walker. (Doc. 101 ¶ 83; Doc. 101, Exhibit E, Mental Health Evaluation, 3/22/12, PCM98; Doc. 109 ¶ 83).

Enright's Diabetic Record Sheet reveals that, from January 2, 2012, through April 2012 and continuing thereafter, Enright's blood sugar was tested several times per day and insulin was administered to him in accordance with the Standard Sliding Scale set forth on the sheet. (Doc. 101 ¶ 84; Doc. 101, Exhibit E, Diabetic Record Sheets, PCM10-30). Enright contends that defendant Heckman and medical staff failed to adhere to the Standard Sliding Scale and a doctor was not called when his level were below 80. (Doc. 109 ¶¶ 84, 114). Perry County Prison Inmate Observation sheets reflect that Enright was on 30-minute watch from the date of his return from the hospital on January 17, 2012, through February 21, 2012, and he was placed on a 60-minute watch thereafter. (Doc. 101 ¶ 85; Doc. 101, Exhibit E, Perry County Prison Inmate Observation, PCM112-190; Doc. 109 ¶ 85).

Upon initial arrival at Perry County Prison, Enright was given a handbook that set forth the grievance process and how to file a grievance. (Doc. 101 ¶ 87; Doc. 101, Exhibit F, Enright Dep. at 26:11- 24; Doc. 109 ¶ 87). Enright understood that in order to file a grievance, he must request a grievance form, fill out the form, and hand it to a correctional officer. (Doc. 101 ¶ 88; Doc. 101, Exhibit F, Enright Dep. at 27:13-18). Enright submitted two sick call requests during his incarceration at the Perry County Prison, one for dental and one for mental health. (Doc. 101 ¶ 89; Doc. 101, Exhibit F, Enright Dep. at 28:11-30:1, 38:1-5, 80:6-12). As a result of these sick

call requests, Enright did in fact see a mental health nurse practitioner and a dentist. (Id.)

Enright did not file any sick call requests regarding his alleged nausea, blurry vision, weight gain, confusion, anxiety, dizziness, lack of motor control, lethargy, excessive thirst, frequent urination, vomiting and shortness of breath. (Doc. 101 ¶ 90; Doc. 101, Exhibit F, Enright Dep. at 35:24-36:7, 36:25-37:4, 80:13-16). Enright never submitted a sick call request or grievance concerning his leg. (Doc. 101 ¶ 91; Doc. 101, Exhibit F, Enright Dep. at 110:24-111:1).

The contract between PrimeCare and Perry County was a limited service contract. (Doc. 101 ¶ 92; Doc. 101, Exhibit C, Weber Dep. at 11:21-23; Doc. 101, Exhibit A, Contract at pp. 2-3; Doc. 109 ¶ 92). The contract provided that, in 2010, PrimeCare would provide 24 hours a week of nursing coverage and three to four hours of provider coverage by a physician, physician assistant, or certified nurse practitioner, which transformed to 40 hours per week in 2011. (Doc. 101 ¶ 93; Doc. 101, Exhibit C, Weber Dep. at 18:21-19:8, 20:2-6; Doc. 109 ¶ 93).

Defendant Nurse Heckman was the on-call medical employee during the time period relevant to the second amended complaint. (Doc. 101 ¶ 98; Doc. 109 ¶ 98). If there was a medical need, defendant Nurse Heckman would be called. (Id.) If the need was outside of her scope of work, she would advise the caller to call the physician assistant. (Doc. 101 ¶ 98; Doc. 101, Exhibit B, Heckman Dep. at 113:24-114:5; Doc. 109 ¶ 98).

PrimeCare provides biannual general instruction to correctional staff regarding observations of serious health concerns. (Doc. 101 ¶ 99; Doc. 109 ¶ 99). Additionally, either Perry County or PrimeCare provided training to correctional staff regarding a non-licensed individual's ability to pass medication. (Doc. 101 ¶ 99; Doc. 101, Exhibit C, Weber Dep. at 35:16-36:10; Doc. 109 ¶ 99).

Steven B. Nagelberg, M.D., board-certified in endocrinology and metabolism, opined that the PrimeCare medical personnel appropriately treated Enright with insulin and diet, and when Enright developed ketoacidosis, it was promptly recognized and Enright was transported to a hospital for treatment. (Doc. 101 ¶ 102). He opined that this treatment was consistent with the standard of care for a patient with newly diagnosed diabetes. (Doc. 101 ¶ 102; Doc. 101, Exhibit L, Nagelberg CV and Report at pp. 3-4). Enright contends that he went days without treatment leading to diabetic ketoacidosis and permanent foot drop. (Doc. 109 ¶ 102).

John Grandrimo, D.O., board-certified in orthopedic surgery, believed that the diabetes treatment Enright received while incarcerated was appropriate. (Doc. 101 ¶ 103). Additionally, Dr. Grandrimo opined, to a reasonable degree of medical certainty, that the treatment Enright received for his pre-existing left leg injury was appropriate. (Doc. 101 ¶ 103; Doc. 101, Exhibit M, Grandrimo CV and Report at pp. 8-9). Enright contends that the treatment he received from prison staff and medical staff was not appropriate. (Doc. 109 ¶ 103).

Richard H. Bennett, M.D., a neurologist, concluded that Enright's left foot drop was caused from a peroneal nerve palsy, caused by the injury he sustained in a motor vehicle accident in Bermuda, prior to his incarceration at the Perry County Prison.  (Doc. 101 ¶ 104; Doc. 101, Exhibit N, Bennett CV, Report at p. 3, and Supplemental Report).  Enright contends that the foot drop was caused by the undiagnosed and mistreated diabetes which led to diabetic ketoacidosis.  (Doc. 109 ¶ 104).

Kimberly M. Pearson, RN, a nurse with 33 years of experience in the healthcare industry and correctional medicine, opined that defendant Heckman performed her duties within the standard of care for a licensed practical nurse in correctional medicine.  (Doc. 101 ¶ 105; Doc. 101, Exhibit O, Pearson CV and Report at p. 18; Doc. 109 ¶ 105).

PrimeCare's Policies and Procedures conform to the standard of care for correctional medicine as they are molded after the accepted national standards of the National Commission on Correctional Healthcare.  (Doc. 101 ¶ 106; Doc. 101, Exhibit O, Pearson Report at p. 18).  Similar to an office setting, it is not outside the standard of care for healthcare staff to not be present at the prison on Saturday and Sunday.  (Doc. 101 ¶ 107; Doc. 101, Exhibit O, Pearson Report at p. 15).  Enright contends that PrimeCare's policies and procedures were inadequate.  (Doc. 109 ¶¶ 106-107).

Enright's glucose level of 419, as reported in the December 31, 2011 lab report, was not deemed a critical value such that emergent notification of the value

was required.  (Doc. 101 ¶ 108; Doc. 101, Exhibit O, Pearson Report at p. 15).

Enright contends that a glucose level of over 400 requires a call to a medical doctor.

(Doc. 109 ¶ 108).  Enright failed to produce any expert reports.  (Doc. 101 ¶ 109; Doc.

109 ¶ 109).

## VI.    **Medical Defendants' Motion for Summary Judgment**

### A.    **Deliberate Indifference to Medical Needs**

#### 1.    ***Exhaustion of Administrative Review***[5]

Enright acknowledges that he did not exhaust the available administrative

remedies available to him at Perry County Prison concerning his diabetes and leg

condition.  (Doc. 111 at 22-24).  In an attempt to excuse the exhaustion requirement,

Enright asserts that he did not avail himself of these remedies because he was

transferred from Perry County Prison to a different facility.  Id.  Enright states that

he "was not an inmate at Perry County Prison at the time he filed the Complaint, so

the PLRA should not apply in the first instance."  (Doc. 111 at 23).  However, as

stated *supra*, Enright's transfer from Perry County Prison, standing alone, does not

excuse his failure to exhaust these administrative remedies.  See Williamson, 131 F.

App'x at 890; In re Bayside Prison Litigation, 2008 WL 2387324, at *4.  Enright

further asserts that while housed at Perry County Prison, he "felt as though inmates

were strongly discouraged from filing grievances."  (Doc. 111 at 23).  Enright set

forth absolutely no evidence that officials at Perry County Prison obstructed his

attempt to exhaust the administrative remedy process, or that his efforts to utilize

---

[5] For the sake of brevity, the court will not restate the PLRA's exhaustion
requirement.

the administrative review process were impeded in any manner.  Therefore,

Enright's claims regarding his diabetes and leg condition fail on administrative

exhaustion grounds.  Nonetheless, the court finds that Enright's deliberate

indifference claims regarding his diabetes and leg condition also fail on the

following substantive grounds.

### 2. *Deliberate Indifference Standard*

The medical defendants assert that Enright fails to establish that they acted

with deliberate indifference to his medical needs.  The Eighth Amendment's

proscription against cruel and unusual punishment requires that prison officials

provide inmates with adequate medical care.  See Estelle v. Gamble, 429 U.S. 97,

103-05 (1976).  In order to establish an Eighth Amendment medical claim, a plaintiff

"must show (i) a serious medical need, and (ii) acts or omissions by prison officials

that indicate deliberate indifference to that need."  Natale, 318 F.3d at 582 (citing

Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one

that has been diagnosed by a physician as requiring treatment or one that is so

obvious that a lay person would recognize the necessity for a doctor's attention."

Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.

1987).  In addition, "if 'unnecessary and wanton infliction of pain' results as a

consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment."  Id.

(citation omitted).

A prison official acts with deliberate indifference to an inmate's serious

medical needs when he "knows of and disregards an excessive risk to inmate health

or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

It can hardly be disputed that Enright's diabetes mellitus and leg condition rise to the level of serious medical conditions for purposes of the Eighth Amendment analysis. The court must determine whether Enright has established a deliberate indifference to those needs.

### a.     Deliberate Indifference to Diabetes

The record reflects that Enright did not report to defendant Heckman or anyone else during intake that he suffered from diabetes or even had symptoms of diabetes. (Doc. 101 ¶ 12; Doc. 109 ¶ 12). Nevertheless, the uncontroverted evidence establishes that Enright was not diagnosed with insulin-dependent diabetes mellitus until January 4, 2012. (Doc. 101 ¶¶ 9, 49; Doc. 101, Exhibit E, Dispensary Card, 1/4/12, PCM41-42; Doc. 109 ¶¶ 9, 49). As previously set forth, the record reflects that Enright received extensive treatment for his diabetes. We need not repeat the numerous medical evaluations, treatments, procedures, hospitalizations, and therapies which Enright received. Suffice it to say that medical staff was

exceedingly attentive to his medical condition and there is no record evidence of deliberate indifference.

Enright takes issue with the nature and timing of the care he received and essentially expresses that he is dissatisfied with the medical care he received and dissatisfied with the medical coverage at the prison. The Third Circuit has repeatedly held, however, that prisoners are not entitled to convert such dissatisfaction into a constitutional claim. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citing Monmouth Cty., 834 F.2d at 346); see also Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."); Falciglia v. Erie Cnty. Prison, 279 F. App'x 138, 142 (3d Cir. 2008) ("[Plaintiff's] dissatisfaction with the diabetic diet does not amount to a constitutional deprivation") (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

### B.    **Monell** Liability

The medical defendants move for summary judgment on Enright's Monell claim, arguing that Enright has not demonstrated deliberate indifference generally, and that the claim fails on the merits. (Doc. 102 at 28-29). The court finds that Enright has not produced sufficient evidence to show that PrimeCare maintained policies, practices, or protocols that that were deficient and directly caused the injuries claimed in this case.

Under § 1983, a private corporation contracted by a prison to provide healthcare for inmates cannot be held liable on a *respondeat superior* theory; rather,

a plaintiff must allege that the entity had a policy, practice, or custom which caused injury to the plaintiff.  Adonai-Adoni v. King, No. 07-3689, 2009 WL 890683, at *2 (E.D. Pa. Mar. 31, 2009) (noting that a private medical provider can only be liable under § 1983 if claim rests "upon some policy, practice or custom"); see also Carpenter v. Kloptoski, No. 1:08-CV-2233, 2010 WL 891825, at *8 (M.D. Pa. Mar. 10, 2010) (concluding that a § 1983 claim against a private medical service solely on the basis that it was responsible for providing health care is subject to dismissal).

Enright asserts that PrimeCare "is responsible for the policies of [Perry County Prison] either by actively participating in the creation of said policies, or acquiescing to operate by them." (Doc. 58 at 21).  He claims that defendant Heckman was frequently absent from work, there was inadequate medical coverage when staff are absent from work, or on weekends, evenings, and holidays, and inmates had minimal access to medical care and staff.  (Id. at 21-22).  Enright further claims there was a policy in place permitting untrained correctional officers to check vital signs of inmates, monitor glucose levels, and tell inmates how much insulin to take.  (Id. at 22).  He asserts that PrimeCare had a policy that required medical staff to review blood sugar logs however, in actuality, the logs were infrequently or never reviewed by PrimeCare staff, and there was no policy in place to ensure calibration of the glucometers and to not share glucometers.  (Id.) Enright also asserts that PrimeCare had an inadequate or nonexistent policy for handling diabetic inmates' needs, including allowing inmates to treat themselves, providing inadequate medical devices, and allowing medical staff to disregard diabetic logs.

The record reflects that PrimeCare provided training to correctional staff twice a year regarding observations of serious health concerns. The record further reflects that either Perry County or PrimeCare provided training to correctional staff regarding a non-licensed individual's ability to pass medication. (Doc. 101, Exhibit C, Weber Dep. at 35:16-36:10). Furthermore, diabetic inmates were educated on how to test their glucose and administer insulin. Inmates could test their blood sugar using a glucometer, and determine the amount of insulin required based on the sliding scale on the form. (Exhibit B, Heckman Dep. at 81:5-7, 85:13-86:4, 118:24-119:22). The court has reviewed the record and is unable to locate any PrimeCare policy that requires medical staff to review blood sugar logs. (See, e.g., Doc. 101, Exhibit B, Heckman Dep. at 117:22-118:5). With respect to Enright's claim that PrimeCare provided inadequate medical devices, the evidence reflects that each glucometer automatically calibrates itself after every use. (Doc. 101, Exhibit B, Heckman Dep. at 117:22-118:5). Nursing expert, Kimberly Pearson, stated that sharing of a glucometer with different lancets and testing strips is the usual and customary practice in the healthcare industry. (Doc. 101, Exhibit O, Pearson Report at p. 15). She clarified that only the lancets and glucose testing strips are specific to each patient. (Id.) Enright has produced no evidence to dispute these facts.

There is simply no evidence that PrimeCare "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." Natale, 318 F.3d at 584. Because Enright failed to develop sufficient evidence to show that PrimeCare maintained constitutionally deficient

policies, practices, protocols or customs that directly caused or contributed to his injuries, PrimeCare is entitled to summary judgment on Enright's <u>Monell</u> claim.

### C. Sixth Amendment Claim

The Sixth Amendment of the United States Constitution applies only in the criminal setting and finds no applicability in the instant action. <u>See</u> <u>Kirby v. Illinois</u>, 406 U.S. 682, 690 (1972) (holding that Sixth Amendment guarantees only apply to "criminal prosecutions"). Enright concedes that the Sixth Amendment is inapplicable to this action. (Doc. 111 at 24). Therefore, the court will grant the medical defendants' motion for summary judgment as to Enright's Sixth Amendment claim.

### D. Substantive Due Process Claim

Enright sets forth a Fourteenth Amendment substantive due process claim based on the medical defendants' deliberate indifference to his medical needs. This claim fails pursuant to the "more-specific-provision" rule. In adopting the "more-specific-provision-rule" established in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 843-44 (1998), the Third Circuit noted that "[u]nder this rule, 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' <u>United States v. Lanier</u>, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (clarifying prior holing in <u>Graham v. Connor</u>, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))." <u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.3d 249, 260-61 (3d Cir. 2010). Because Enright's claim fits squarely within the Eighth Amendment deliberate

indifference claim, the more-specific-provision rule forecloses Enright's substantive due process claim.

**VII.  <u>Conclusion</u>**

For the reasons set forth above, defendants' motions (Docs. 96, 100) for summary judgment will be granted.

An appropriate order shall issue.


<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        September 28, 2018